IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | : | |
|---|---|---|
| WHITFORD LAND TRANSFER COMPANY, INC., | : : : | CIVIL ACTION |
| Plaintiff, | : : | |
| v. | : : | No. 08-0071 |
| SENECA INSURANCE COMPANY, INC., | : : | |
| Defendant. | : : | |

# MEMORANDUM

**ROBERT F. KELLY, Sr. J.**                                                                OCTOBER 31, 2008

Presently before this Court is a Motion for Summary Judgment, pursuant to Fed. R. Civ. P. 56, filed by Seneca Insurance Company, Inc. ("Seneca"). For the following reasons, Seneca's Motion is granted.

**I.      BACKGROUND**

Whitford Land Transfer Company, Inc. ("Whitford") is a title insurance agency. It provides title searches, title insurance and other settlement services in connection with residential and commercial real estate transactions. Whitford obtained professional liability insurance from Seneca. Seneca is a commercial property and casualty insurance company, and beginning on April 12, 2005, it issued three successive one year claims-made professional liability insurance policies (also known as Errors & Omissions ("E&O") policies) to Whitford as the named insured. These policies obligated Seneca, subject to various policy terms, conditions and exclusions, to pay any damages Whitford incurred as a result of alleged acts or omissions

committed by Whitford in the course of rendering professional services during the coverage period. Each of the three policies at issue had been obtained pursuant to Whitford's submission of applications executed and completed in their entirety by Whitford's president, Bruce G. Taylor ("Taylor").

Each application had separate questions as to whether claims had previously been made against the applicant[1] and whether the applicant was aware of "any act, error or omission which might reasonably be expected to give rise to a claim" in the future. (Def.'s Ex. A-C.) In Whitford's initial application of April 8, 2005, Mr. Taylor answered "no" to the inquiries concerning prior claims and knowledge of potential claims. Mr. Taylor signed the initial application (as well as subsequent applications) directly above a statement that "No material fact" has "been suppressed and/or misstated." (Def.'s Ex. A-C.) In connection with Whitford's renewal application for its second year of coverage from Seneca for the policy period April 12, 2006 to April 12, 2007, Whitford submitted an application which, similar to its initial application the prior year, was executed by Mr. Taylor, and which answered "no" and "no" to the two questions concerning prior claims and knowledge of errors and omissions underlying "reasonably expected" potential claims.

---

[1] Question 8 on the April 8, 2005 application asks: "Has any claim been made during the past five years against the applicant, their predecessors in business or any of the present or past partners?" Question 8 further states: "If Yes, call for supplemental claim form." (Def.'s Ex. A.) Question 8 on the March 6, 2006 renewal application asks: "Has any claim been made against the applicant in the last five (5) years?" Question 8 further states: "If 'Yes,' attach description of the claim(s), amounts paid and/or reserved for claim settlement." (Def.'s Ex. B.) Question 8 on the March 26, 2007 renewal application asks: "Have any claims been made in the past against the applicant, their predecessors in business or any of the present or past partners that have not been reported to Seneca?" Question 8 further states: "If Yes," state "How many" and "complete a Seneca Claims supplement for each one." (Def.'s Ex. C.)

In 2005 or 2006,[2] Whitford learned that Fidelity National Title Insurance Company ("Fidelity"), a title insurance underwriter,[3] intended to make a claim against it for losses incurred in connection with a title insurance policy Whitford issued to Grand Bank, N.A. ("Grand Bank"). The title insurance policy Whitford issued stated that Grand Bank had a first lien on a mortgaged piece of property, but in reality the land was encumbered by multiple liens of record. One of the prior lien holders sought to foreclose, and Fidelity was required to settle the foreclosure. Fidelity sought compensation from Whitford for the loss. Whitford notified Seneca of the claim, and Seneca undertook representation of its insured in the matter. Seneca began investigating Fidelity's claim against Whitford, and during this initial phase informed Whitford that it was doing so pursuant to a reservation of right.

Whitford's renewal application, which was submitted on March 6, 2006, did not identify the Fidelity claim submitted to Seneca only weeks earlier, and Seneca's underwriters initially computed a renewal premium of $11,917. However, following the initial calculation of the renewal premium, Seneca's underwriters obtained information from Seneca's claims department of the Grand Bank matter. Thus, notwithstanding Whitford's omission of the prior Fidelity claim on the renewal application, Seneca was able to properly categorize Whitford at the time of the

---

[2] The parties disagree as to the date which Whitford learned of Fidelity's intent to make a claim against it. Whitford alleges that it learned of the potential claim "[i]n or about January 2006" (Pl.'s Resp. Def.'s Mot. Summ. J. at 2), while Seneca alleges that Whitford had knowledge of the claim "no later than January 28, 2005." (Def.'s Memo. Supp. Mot. Summ. J. at 2.) As discussed herein, this Court need not decide the issue of when Whitford had knowledge of Fidelity's intent to make a claim because summary judgment for Seneca is adequately supported by alternative grounds.

[3] Fidelity issues insurance policies to property owners and lenders protecting them against adverse title claims. Fidelity does not issue these policies directly, but rather utilizes a network of title agents for that task, and underwrites the policies once its agents write them. The errors and omissions insurance policies issued by Seneca do not name Fidelity as an additional insured, and include express exclusions and prohibitions which limit coverage and prevent Whitford from assigning the policy to others.

issuance of the 2006-2007 policy as an entity with a prior claim. As such, Seneca determined that Whitford was no longer eligible for the initial renewal premium of $11,917, as it had been calculated on the mistaken basis that Whitford was an entity with no prior claims. As a result, Seneca calculated and charged a new renewal premium of $19,440 for the 2006-2007 Whitford coverage.

Seneca regarded Whitford's omission of the Fidelity claim in its second application as a "suspicious circumstance" and "one of the factors causing Seneca to order a Dun and Bradstreet report" ("D&B report") on Whitford when it came up for renewal the following April for 2007-2008 coverage. (Def.'s Memo. Supp. Mot. Summ. J. at 5.) Whitford submitted its third application to Seneca in March of 2007. This time, Whitford disclosed the existence of a single prior claim, which appeared to Seneca to relate to the Grand Bank matter noticed to Seneca on February 21, 2006. However, prior to Seneca's receipt of that third application, and in anticipation of the upcoming renewal, it obtained the above-referenced D&B report in March of 2007. The D&B report revealed two prior claims against Whitford, which Whitford had not disclosed to Seneca on any of its prior applications: <u>McElya v. Whitford</u> and <u>Country Estate Fence, Inc. v. Whitford</u>.[4] Seneca alleges that it then sought information from Whitford as to the two claims discovered on the D&B, but did not receive a response until after Seneca had been required to issue the third policy at issue, effective April 12, 2007.[5] Nonetheless, based on the D&B claims Seneca alleges it charged the "max" it was permitted to charge for 2007-2008,

---

[4] As the <u>Country Estate Fence</u> claim was made more than five years before Whitford's first application, Seneca is not relying on the <u>Country Estate Fence</u> claim as a basis for rescission.

[5] Seneca alleges that, except when canceling or non-renewing for a material misrepresentation, non-renewal of its policies generally require 60 days' notice. Seneca's underwriting files reflect a note as of March 30, 2007 that it was then "too late to non renew."

which was $20,262, reduced the coverage by doubling the deductible to $10,000, and deleted a provision that previously eliminated defense costs from the insured's deductible obligation. Seneca also began the process of canceling the 2007-2008 policy based on the two D&B claims and what Seneca considered a "material misrepresentation" by Whitford on its 2007 application.

In August of 2007, after further investigation, Seneca's coverage counsel provided Seneca with a report of prior lawsuits that had been filed against Whitford. The investigation revealed the existence of six additional lawsuits (beyond the two lawsuits discovered in the March 2007 D&B report) in which Whitford had been sued for alleged negligence or deliberate wrongdoing in the rendering of title agent services, either as a defendant, a counterclaim defendant or a third-party defendant. None of the lawsuits found in either the D&B report or by Seneca's investigation had been identified as prior claims in any of the three applications Whitford had previously submitted to Seneca.

On August 6, 2007, Fidelity made a demand on Whitford. On August 16, 2007, Seneca appointed defense counsel to represent Whitford's interests. Seneca also reiterated its reservation of rights, and stated specifically that it reserved the right to cancel or rescind Whitford's liability insurance on the basis of material misrepresentation or fraud. On August 21, 2007, Seneca sent notice to Whitford of cancellation of the third policy for the 2007-2008 policy year for "material misrepresentation," and then refunded the premium due to Whitford as a result of the cancellation of the 2007-2008 policy.

On November 16, 2007, Fidelity filed an action in the Chester County Court of Common Pleas against Whitford in regard to the claim resulting from the Grand Bank title insurance policy. On December 5, 2007, Whitford commenced a declaratory judgment action in that same

court seeking a determination as to whether Seneca is obligated to provide a defense and coverage under the professional liability policy in regard to Fidelity's claim against Whitford. Seneca removed that declaratory judgment to this Court on January 4, 2008 and filed a counterclaim for rescission based on (i) the non-disclosure by Whitford in any of the three applications of lawsuits charging it with negligent or intentionally wrongful performance of professional services, which were identified in the D&B report and in Seneca's investigation,[6] and (ii) the non-disclosure by Whitford in its initial application of April 8, 2005 of the Grand Bank matter as a "potential claim of which it had knowledge no later than January 28, 2005." (Def.'s Memo. Supp. Mot. Summ. J. at 1-2.)  On August 25, 2008, Seneca filed a Motion for Summary Judgment under Fed. R. Civ. P. 56.

## II.     STANDARD OF REVIEW

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper if "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477

---

[6] In its counterclaim, Seneca relies on the following undisclosed lawsuits as one of its bases for rescission: McElya v. Whitford Land Transfer, Inc., et al., Court of Common Pleas of Chester County, Pa., Civil Action No. 01-02974; Whitford Land Transfer, Inc. v. Campbell, Court of Common Pleas of Chester County, PA., Civil Action No. 03-00323; DiGregorio v. Commerce Bank v. Whitford Land Transfer Co., et al., U.S. District Court, E.D.Pa., Civil Action No. 03-5824; Salamon v. Whitford Land Transfer Co., et al., Court of Common Pleas of Chester County, Pa., Civil Action No. 02-02864; L.G. Fin. Consultants, Inc. v. Whitford Land Transfer Co., Court of Common Pleas of Chester County, Pa., Civil Action No. 01-09061; Mortgage Elec. Regis. Sys., Inc. v. Whitford Land Transfer, Inc., Court of Common Pleas of Chester County, Pa., Civil Action No. 02-06924; Machikas v. Whitford Land Transfer Co., Inc., Court of Common Pleas of Chester County, Pa., Civil Action No. 05-09151; and Swartley v. Whitford Land Transfer, Inc., et al., Court of Common Pleas of Montgomery County, Pa., Civil Action No. 06-25660. (Def.'s Countercl. at 9.) Seneca's Motion for Summary Judgment discusses the facts of only four of the above lawsuits. For the reasons set forth herein, this Court finds that the non-disclosure of those four lawsuits is sufficient to support a grant of summary judgment in favor of Seneca.

U.S. 242, 251-52 (1986).  The moving party has the initial burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party.  Anderson, 477 U.S. at 249.  A factual dispute is material only if it might affect the outcome of the suit under governing law.  Id. at 248.

To defeat summary judgment, the non-moving party cannot rest on the pleadings, but rather that party must go beyond the pleadings and present "specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2).  Similarly, the non-moving party cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion.  Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir. 1989) (citing Celotex, 477 U.S. at 325).  Further, the non-moving party has the burden of producing evidence to establish prima facie each element of its claim.  Celotex, 477 U.S. at 322-23.  If the court, in viewing all reasonable inferences in favor of the non-moving party, determines that there is no genuine issue of material fact, then summary judgment is proper.  Id. at 322; Wisniewski v. Johns-Manville Corp., 812 F.2d 81, 83 (3d Cir. 1987).

**III.   DISCUSSION**

Seneca seeks summary judgment against Whitford for rescission *ab initio* of the insurance policies at issue on the two alternative grounds set forth in its counterclaim.  Under Pennsylvania law, "when an insured secures an insurance policy by means of fraudulent misrepresentations, the insurer may avoid that policy."  Rohm & Haas Co. v. Cont'l Cas. Co., 781 A.2d 1172, 1179 (Pa. 2001).  An insurer must demonstrate "(1) that the representation was

false; (2) that the insured knew that the representation was false when made or made it in bad faith; and (3) that the representation was material to the risk being insured." N.Y. Life Ins. Co. v. Johnson, 923 F.2d 279, 281 (3d Cir. 1991) (applying Pennsylvania law).

Whitford argues that there are "genuine issues of material fact" which preclude a grant of summary judgment in favor of Seneca. These purported issues are (1) "whether 'claim' is ambiguous in the context of the insurance application;" (2) "whether a reasonable person could have construed the application to consider that a 'claim' refers only to claims that could create exposure for the E&O carrier;" (3) "whether Whitford made . . . misrepresentations knowingly or in bad faith;" (4) "whether those alleged misrepresentations were 'material' to Seneca;" and (5) "whether Whitford knew or should have known of the Fidelity Claim at any time prior to January 2006." (Pl.'s Resp. Def.'s Mot. Summ. J. at 33-34.)

### A.   Whether "Claim" is Ambiguous in the Context of the Insurance Application

Seneca does not define the term "claim" in the applications at issue. However, that does not necessarily mean that the term is ambiguous. See Bensalem Tp. v. W. World Ins. Co., 609 F. Supp. 1343, 1347-48 (E.D. Pa. 1985) (finding that, although the insurance policy did not define "claim," "for purposes of determining coverage under a claims made policy, a claim is a demand for something as a right" (internal quotations omitted)); Hoyt v. St. Paul Fire & Marine Ins. Co., 607 F.2d 864, 867 (9th Cir. 1979) (finding that, although "claim" was not expressly defined in the insurance policy, "the 'claim' contemplated is unambiguously in the nature of a demand or notice"); Ins. Corp. of Am. v. Dillon, Hardamon & Cohen, 725 F. Supp. 1461, 1468 (N.D. Ind. 1988) (stating that, although "[t]he term claim is not defined anywhere in the policy . . . . that

does not lead to the conclusion that the term is ambiguous"); ITC Invs., Inc. v. Employers Reinsurance Corp., No. 98-115128, 2000 WL 1996233, at *7 (Conn. Super. Ct. Dec. 11, 2000) ("Concentrating on the application itself and the fact that 'claim' is not defined therein, the overwhelming weight of authority holds that such a failure of definition does not create ambiguity. Why? Because these courts give the word its common meaning."). On the contrary, "[t]he term claim is one of the commonest terms in the law." Dillon, 725 F. Supp. at 1468; see also St. Paul Fire & Marine Ins. Co. v. Haw. Ins. & Guar. Co., 637 P.2d 1146 (Haw. Ct. App. 1981), (quoting 8 Bac. Abr., where Lord Coke said "the word demand is the largest word in the law, except claim"). "The word is derived from the latin clamor, meaning a call, a demand. In its ordinary sense the term imports the assertion, demand or challenge of something as a right; the assertion of a liability to the party making it to do some service or pay a sum of money . . . ." Uintah State Bank v. Ajax, 297 P. 434, 437-38 (Utah 1931) (quoting 11 C.J. 816). Black's Law Dictionary defines "claim" as a "[d]emand for money or property as of right, *e.g.* insurance claim." Black's Law Dictionary 247 (6th ed. 1990); see also Dillon, 725 F. Supp. at 1469 (using Black's Law Dictionary to construe the plain and ordinary meaning of the word "claim" and defining the term as "a demand for money or property or some specific remedy").

     Ambiguities exist only where "reasonably minded people have honest differences." Dillon, 725 F. Supp. at 1468. "Reasonably minded people would have no trouble figuring out what the word claim means when that word stands alone without some other word or phrase which would suggest an odd or unusual meaning. This is particularly true in the context of a claims made policy." Id. at 1469. Therefore, this Court does not believe that the term "claim," unqualified as it appears in the applications, can be considered ambiguous simply because Seneca

failed to define it.

> **B.    Whether a Reasonable Person Could Have Construed the Application to Consider that a "Claim" Refers Only to Claims that Could Create Exposure for the E&O Carrier**

Whitford argues that, "since the application was for an E&O policy, it would be logical and reasonable for an applicant to assume that this question [inquiring about prior claims] is referring to claims that might create potential liability for the E&O insurer." (Pl.'s Resp. Def.'s Mot. Summ. J. at 11.)  Whitford argues that "not only did Whitford not seek any E&O coverage for any of the . . . claims, but in addition . . . three of the four actions had been discontinued before Whitford submitted its insurance application to Seneca." (Id.)  Therefore, Whitford asserts that "[i]f a 'claim' had been settled or discontinued, obviously there would be no possible exposure to the potential insurer.  Under those circumstances, it would be extremely reasonable for an applicant to consider that a 'claim' which has been discontinued is, for all practical purposes, non-existent." (Id.)  Whitford also sets forth the following hypothetical:

> By analogy, consider a scenario wherein an applicant for motor vehicle insurance is asked about previous "accidents."  Would the applicant be expected to report on his application each time he had fallen down a step, or tripped over a ladder, even though each of those events could arguably be considered an "accident"?  On the contrary, in light of the purpose of the application, it is respectfully submitted that a reasonable person would logically consider that any inquiries about previous "accidents" would be referring to motor vehicle accidents, since it is only motor vehicle accidents that could increase the risk to the <u>motor vehicle</u> insurance carrier and be considered by the underwriter.

(Pl.'s Resp. Def.'s Mot. Summ. J. at 9 (emphasis in original).)

The arguments submitted by Whitford are simply irreconcilable (1) with the language of the applications, (2) with the testimony of Mr. Taylor, (3) with the facts of the undisclosed lawsuits, and (4) with the law.

As already discussed, this Court does not find "claim," unqualified as it appears in the applications, to be ambiguous.  Moreover, Mr. Taylor stated in his deposition that his understanding of the term "claim" is that it "has to do with . . . an action where someone has the potential to have you pay something to them."  (Taylor Dep., Def.'s Ex. R at 80.)  In responding to the next question of whether a "claim" "involve[s] a matter in which there was a judgment or an award of damages," Mr. Taylor stated, "[s]ure, or an allegation."  The foregoing undisclosed lawsuits fit not only the dictionary definition of "claim," ie., "a demand for money," but also Mr. Taylor's purported understanding of the term, ie., something that "has to do with" "an allegation"or "an action where someone has the potential to have you pay something to them." (Taylor Dep., Def.'s Ex. R at 80.)

The complaint in McElya[7] alleged:

> [d]efendants was [sic] negligent in conducting their search of the record in failing to include the Federal Tax Lien in their Commitment for Title Insurance.  As a result of the negligence of Defendants, Plaintiff was required to pay the sum of $57,065.91 in order to provide free and clear title to Buyers.

(McElya  Compl. ¶¶ 30-31, Def.'s Ex. C.)  Whitford argues that, "[s]ince Fidelity paid the full verdict amount, and reimbursed Whitford for all of its fees incurred therewith, Whitford did not consider this to constitute any legitimate claim against Whitford.  Moreover, the case was discontinued of record on August 5, 2003, more than 1 ½ years before Whitford submitted the Seneca application."  (Pl.'s Resp. Def.'s Mot. Summ. J. at 9.)

---

[7] McElya was filed on April 4, 2001 and tried in April of 2003.  Following trial, a verdict in the amount of $57,065.91 was entered against Whitford and Fidelity.

11

In Campbell,[8] the allegations in the counterclaim included (1) that the "[s]ettlement clerk for Whitford negligently gave the net deposit auction proceeds check to Campbell and her attorney at the time of closing," (2) that Whitford "failed to advise the sellers or the buyers of its error in a reasonable or timely manner," and (3) that, "[b]ecause of [Whitford's] own negligence, dilatory and abysmal accounting practices including but not limited to that of its own settlement clerk, an overpayment and/or credit was made to the Campbells which went undetected by them during the period of their negotiation and disposition of marital funds." (Campbell Compl. ¶ 74, Def.'s Ex. F.) The counterclaim further states that

> [i]f, by way of final disposition, Ann Campbell is determined to owe any sums to Whitford Land Transfer, then those sums will be offset by any sums of money Whitford may owe her by way of their own negligence, their arbitrary, vexatious, obdurate, or dilatory conduct pursuant to 42 Pa. C.S.A. §2053(7) and (9) and/or Rule 1023.1 violations. (Campbell Compl. ¶ 83, Def.'s Ex. F.)

Whitford argues:

> [I]t is clear that the counterclaim did not seek any affirmative relief, but on the contrary was asserted merely as a "set-off" or defense to Whitford's claims should Whitford be entitled to any recovery. The matter was settled and Whitford recovered the funds it sought from the seller's attorneys. The matter was discontinued of record on November 21, 2003, nearly 1 ½ years prior to the inception of Seneca's coverage.

(Pl.'s Resp. Def.'s Mot. Summ. J. at 10 (internal citations and footnotes omitted).)

Another case against Whitford prior to its initial application, DiGregorio,[9] involved a claim that a refinancing through Commerce Bank had been fraudulently obtained because the

---

[8] In Campbell, Richard and Anna Marie Campbell sued Whitford on February 19, 2003 as a counterclaim defendant following Whitford's suit to recover an overpayment of funds that Whitford allegedly disbursed improperly at a real estate closing.

[9] In DiGregorio, Whitford was sued on March 31, 2004 in a third-party complaint by Commerce Bank.

property at issue, owned by a husband and wife, had allegedly been mortgaged on the basis of a "signature" by the wife having been "a forgery." (DiGregorio Compl. at 2, Def.'s Ex. H.) Commerce Bank sued Whitford on the basis that Commerce had provided Whitford with "settlement instructions" to protect against forgeries which Whitford had failed to follow. (DiGregorio Compl. at 4-5, Def.'s Ex. H.) Whitford argues: "Plaintiff brought suit only against Commerce Bank, the lender, which then joined Whitford as a third-party defendant. There were copies of notarized documents, licenses, etc., and Plaintiff voluntarily dismissed the action on March 15, 2005, again prior to Whitford's application to Seneca." (Pl.'s Resp. Def.'s Mot. Summ. J. at 10 (internal citations and footnotes omitted).)

Finally, Salamon,[10] the fourth lawsuit against Whitford prior to its initial application to Seneca, involved a failed real estate transaction. The plaintiffs, buyers of real estate, alleged that they issued a check for $44,190 payable to Whitford to be deposited into an escrow account and that Whitford improperly disbursed the funds to the sellers. The complaint alleges that "Whitford's . . . conduct was negligent and breached the duty it owed the Plaintiffs to notify them of a misdelivery and to return any misdelivered check. By reason of Whitford's negligence, the Plaintiffs' [sic] have been injured in the amount of the Escrow Deposit . . . ." (Salamon Compl. ¶¶ 28-29, Def.'s Ex. I.) Whitford argues:

> The action was discontinued of record on June 27, 2005 and Whitford was not required to pay out any funds in connection with this action. While it is acknowledged that this discontinuance was after the inception of Seneca's coverage, nonetheless, again, Whitford never sought any E&O coverage for this "claim" and accordingly, Whitford did not consider this to be a "claim" for purposes of its E&O application.

---

[10] Salamon was filed on April 14, 2004.

(Pl.'s Resp. Def.'s Mot. Summ. J. at 11 (internal citations and footnotes omitted).)

The undisclosed lawsuits previously discussed all involved allegations of wrongful conduct by Whitford in rendering professional services.  Mr. Taylor's purported understanding of the term "claim" as "an action where someone has the potential to have you pay something to them" does not excuse the non-disclosures, either factually or legally.  To the contrary, no justification exists either in the application language or in the law for the non-disclosures based on such purported understanding.  Indeed, as a factual matter, each of the lawsuits which Whitford failed to disclose involved the "potential" to have Whitford "pay something," including those as to which Whitford may have been indemnified.  Therefore, this Court finds that a reasonable person in Mr. Taylor's position could not have construed "claim" in the applications as meaning only those claims that could create exposure for Seneca.

> C. **Whether Whitford Made the Alleged Misrepresentations Knowingly or in Bad Faith**

Whitford asserts:

> Mr. Taylor believed in good faith that none of the lawsuits now relied upon by Seneca constituted a "claim" for purposes of the application to Seneca.  On the contrary, Mr. Taylor reasonably believed that a "claim" would refer only to claims which could create possible exposure to Seneca, so that Seneca could evaluate whether it would be at risk for any of those claims.

(Pl.'s Resp. Def.'s Mot. Summ. J. at 12-13 (internal citations omitted).)

For the policy to be avoided on the grounds that the false statements materially affected the risk accepted or the hazard assumed by the insurer, the insurer need only establish that the applicant knew the statements were false when made.  Provident Life & Accident Ins. Co. v. Charles, No. 90-7584, 1993 U.S. Dist. LEXIS 5030, at *13 (E.D. Pa. Apr. 14, 1993), aff'd, 14

F.3d 48 (3d Cir. 1993). In such a case, the statements need not have been made with intent to deceive. Id. "Ordinarily whether the insured knew that the statements on an insurance application were false at the time they were given, or whether the misstatement of fact was made in bad faith, is a question of fact for the jury." Id. at 18; see also Grimes v. Prudential Ins. Co., 585 A.2d 29, 31 (Pa. Super. Ct. 1991). However, "[t]he circumstances preceding and attending the making of the statements may be such that the insured may be said to have been aware of their falsity at the time, or that an inference of fraud is otherwise irresistible . . . ." Evans v. Penn Mut. Life Ins. Co., 186 A. 133, 138 (Pa. 1937).

Courts have repeatedly held that an alleged misunderstanding of a question on an insurance application does not preclude summary judgment for rescission to the insurer where, for example, the insured "could not have innocently failed to inform" the insurer of the information omitted. See, e.g., Charles, 1993 U.S. Dist. LEXIS 5030, at *23; Hager v. N. Am. Co. for Life & Health Ins., No. 87-4343, 1988 U.S. Dist. LEXIS 5360, at *7 (E.D. Pa. June 14, 1988) (finding that "where statements [in an insurance application] are shown to have been given by the insured under such circumstances that he must have been aware of their falsity," summary judgment of rescission for the insurer is appropriate); Monarch Life Ins. Co. v. Donahue, 708 F. Supp. 674, 676 (E.D. Pa. 1989) (granting summary judgment where it was "inconceivable" that the insured "was unaware" of the omitted information requested by the application, and finding "the only reasonable inference" was that the insured "made these statements in bad faith and with knowledge of their falsity"). In Seneca Ins. Co., Inc. v. Lexington and Concord Search and Abstract, LLC, No. 07-714, 2008 U.S. Dist. LEXIS 40477 (E.D. Pa. May 19, 2008), Judge Robreno granted summary judgment to Seneca for failure of its insured to disclose both prior

claims and potential claims on the exact policy applications at issue in this case, and emphatically rejected the legal sufficiency of the argument that non-disclosure was justified on the basis that a lawsuit was believed not to present potential liability to the insurer.  The court in Lexington stated:

> Even if [the president of defendant corporation] could have satisfied the claims without Seneca's involvement, [the president] would not have been freed from his obligation to be truthful in the application for insurance coverage. The purpose of Seneca's inquiry into the acts or omissions that might give rise to a claim was to learn as much as possible about the potential risk it faced.  By denying Seneca this pertinent information, [defendant] deprived Seneca of the ability to develop the proper calculus with which to accurately estimate the risk of the policy.

Lexington, 2008 U.S. Dist. LEXIS 40477, at *9-10 (internal citation omitted).  The Lexington court ruled that an insured's "impression of the extent to which it was subject to potential liability [in undisclosed prior lawsuits] is irrelevant to its obligations to Seneca." Id. at *11.

Here, Whitford could not have "innocently failed to inform" Seneca of the aforementioned lawsuits, all of which alleged misconduct in its professional services, and all of which involved conduct that threatened "potential liability" for Whitford, as Mr. Taylor purported to understand the applications' questions.  No possible misunderstanding by Whitford could excuse its failure to provide the information sought in the applications, which Mr. Taylor himself described as "very simple."  (Taylor Dep. at 85, Def.'s Ex. R.)  Even if Whitford was not trying to deceive, the law does not require intent to defraud, but merely that the answer to the inquiry is knowingly false.  As already discussed, this Court finds that the term "claim" is unambiguous.  The questions on the applications as to whether "any claims [have] been made" "against the applicant" in "the past five years" are not qualified by any language as to whether those lawsuits were meritorious or involved loss, or cost, or indemnification.  Because Whitford

flatly answered "no" to these questions, this Court finds that Whitford knowingly made misrepresentations on its applications to Seneca.

### D. Whether the Alleged Misrepresentations Were "Material" to Seneca

Whitford argues that, to establish materiality,

> Seneca must establish that if it had known of the previous lawsuits, it would not have written the policy. In this regard . . . it must be remembered that Seneca twice renewed Whitford's policy even after being notified of the Fidelity claim, a claim which could have conceivably created exposure to Seneca for the full amount of the Seneca Policy limits, well in excess of the amounts at issue in all of the previous "claims" combined.

(Pl.'s Resp. Def.'s Mot. Summ. J. at 16-17 (emphasis in original).) Whitford's notion of materiality is much narrower than that of courts applying Pennsylvania law, which generally consider a statement to be "material" where it is relevant to the risk assumed. See, eg., Am. Franklin Life Ins. Co. v. Galati, 776 F. Supp. 1054, 1060 (E.D. Pa. 1991) (stating "[i]nformation on an insurance application is material if knowledge or ignorance of it would influence the decision of the issuing insurer to issue the policy, or the ability of the insurer to evaluate the degree and character of risk, or the determination of the appropriate premium rate"); Johnson, 923 F.2d at 282 (stating "[a]nything which increases the risk cannot be immaterial" (quoting Hartman v. Keystone Ins. Co., 21 Pa. 466 (Pa. 1853)); A.G. Allebach, Inc. v. Hurley, 540 A.2d 289, 295 (Pa. Super. Ct. 1988) (stating "[i]nformation is said to be material if knowledge or ignorance of it would naturally influence the judgment of the insurer in issuing the policy, in estimating the degree and character of the risk, or in fixing the premium rate"). Further, "a misrepresentation may be material even though it does not affect determination of the premium." Charles, 1993 U.S. Dist. LEXIS 5030, at *17-18.

Here, as already discussed, the Fidelity claim did in fact affect the determination of the premium, as Seneca's underwriters initially computed a renewal premium of $11,917 for 2006-2007, but ultimately charged Whitford a premium of $19,440 for that period once Seneca learned of the Grand Bank matter.  Further, after Seneca received the D&B report containing the undisclosed prior lawsuits against Whitford, it increased the premium for 2007-2008 to $20,262, doubled the deductible to $10,000, and deleted a provision that previously eliminated defense costs from the insured's deductible obligation.  Notwithstanding these increases in the premiums, this Court finds that the undisclosed lawsuits previously discussed – all of which involved allegations of wrongful conduct by Whitford in rendering professional services – would have undoubtedly been relevant to the risk assumed by Seneca in providing Whitford with E&O coverage.  Therefore, this Court finds that Whitford's misrepresentations were clearly material.

### E.  Whether Whitford Knew or Should Have Known of the Fidelity Claim at Any Time Prior to January of 2006

Because we find that Whitford knowingly made material misrepresentations as to the existence of prior claims, and because those misrepresentations in themselves entitle Seneca to rescind Whitford's policies, the issue of whether Whitford knew or should have known of the Fidelity Claim at any time prior to January of 2006 need not be decided by this Court.

An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| WHITFORD LAND TRANSFER COMPANY, INC., | CIVIL ACTION |
| Plaintiff, | |
| v. | No. 08-0071 |
| SENECA INSURANCE COMPANY, INC., | |
| Defendant. | |

**ORDER**

**AND NOW**, this 31st day of October, 2008, upon consideration of Seneca Insurance Company's Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56 (Doc. No. 17), and the responses and replies thereto, it is hereby **ORDERED** that the Motion is **GRANTED**.

BY THE COURT:

/s/ Robert F. Kelly
ROBERT F. KELLY
SENIOR JUDGE